**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JENNIFER R. GARNER,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **PHILADELPHIA HOUSING** | **NO.  15-183** |
| **AUTHORITY, ANTHONY SAMPSON,** | |
| **FAISAL HASSAN, KELVIN A.** | |
| **JEREMIAH, JOANNE R. STRAUSS,** | |
| **ETHAN CHAPMAN, and JOHN AND** | |
| **JANE DOES,** | |
| **Defendants.** | |

<u>**OPINION**</u>

Plaintiff Jennifer Garner brings this suit against her former employer, the Philadelphia Housing Authority ("PHA") and PHA officials Anthony Sampson, Faisal Hassan, Kelvin Jeremiah, Joanne Strauss, and Ethan Chapman, (collectively the "Individual Defendants"), claiming unlawful sex-based discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*; retaliation and interference with her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and retaliation for protected activity under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, arising from allegedly discriminatory overtime allocation, sexual harassment, and her eventual layoff from her job as a computer technician.  She has also claimed a breach of the PHA's overtime and non-discrimination policies arising from the same alleged conduct.  Defendants have filed a motion for summary judgment on all of Plaintiff's claims.  The motion shall be granted in part and denied in part.

1

I.      **BACKGROUND**

   A.  **Plaintiff's Employment with the PHA**

Plaintiff was hired by PHA as a Computer Technician in 1999.  Joint Appendix ("J.A."

80.  At the time, PHA had only one other Computer Technician, Richard Brown ("Brown"), but

a third, Edward McCarthy ("McCarthy"), was hired within months, and a fourth employee,

Robert Kaewell ("Kaewell"), was transferred to the Computer Technician position a few years

later.  J.A. 81, 104.  All four Computer Technicians worked in the Information Systems

Management ("ISM") Department at PHA, although Brown and McCarthy did not share a

supervisor with Plaintiff and Kaewell until 2008.  J.A. 104, 150.

   1.  **Interim Supervision by Sampson**

From mid-2006 through early-2008, Plaintiff (and Kaewell) were supervised by Deputy

Chief Information Officer Anthony Sampson ("Sampson") became.  J.A. 150.  During this time

period, Plaintiff and Kaewell's primary job task was to staff the PHA Help Desk, which entailed

answering phone and e-mail inquiries concerning computer problems, providing assistance if

possible, and creating "tickets" to track reported problems, which could then be assigned to other

staff – including Brown and McCarthy – if a problem required in-person assistance.[1]  J.A. 103.

On January 2, 2008, at Plaintiff's request, Sampson provided an evaluation of Plaintiff's work.

He rated her as "Needs Improvement" in all but one category and attached a two-page list of

concerns with her performance.  J.A. 258, 259, 263-64.  Plaintiff objected to Sampson's rating,

and protested that he had not raised any of the concerns cited in the evaluation prior to her

requesting the evaluation.  J.A. 260.

---

[1] It is unclear if Plaintiff's duties were limited to staffing the Help Desk prior to 2006.  The Help Desk is not a
physical job location.  Rather, the phone calls and e-mails submitted to the "Help Desk" are routed to the phone
lines and e-mail accounts of whichever employees are responsible for Help Desk coverage at a given time.  J.A. 105.

### 2. Supervision by Chapman

Shortly after that evaluation, as a result of internal re-organization, Plaintiff and Kaewell were transferred to the supervision of Network Administration Manager Ethan Chapman ("Chapman"), who had been supervising Brown and McCarthy since 2001.  J.A. 103.  Brown and McCarthy had been responsible for on-site troubleshooting field work at PHA's numerous locations throughout Philadelphia, and after Plaintiff and Kaewell were transferred to Chapman's supervision, Chapman aligned the job tasks so that all four Computer Technicians were responsible for both Help Desk coverage and field work.  J.A. 103, 105, 154.  All four maintained their offices at the PHA's Wilson Park office, and each was assigned a PHA vehicle to facilitate their field work.  J.A. 104.

### a.   Overtime Allocation Among Computer Technicians

In July 2009, Plaintiff e-mailed Chapman about the procedure for requesting overtime, and complained that "I go out in the field just like the guys and yet they get offered overtime and I don't."  J.A. 261.  It is not clear if Chapman responded, but Plaintiff eventually filed a grievance with the union and a discrimination complaint alleging that McCarthy, Brown, and Kaewell received "several hundred hours" of overtime while Plaintiff received only "fourteen – twenty one [sic] hours" in the past year.  J.A. 41, 267.

Payroll records indicate that from January 2008, when the Computer Technicians were consolidated under Chapman's supervision, until July 2010, when Kaewell retired and McCarthy was promoted to Network Administrator, Kaewell was paid for 31.5 hours of overtime across 6 dates, McCarthy was paid for 79.5 hours across 13 different dates, and Plaintiff was paid for 27.75 hours arising from 5 instances of overtime.  J.A. 377, 378, 601.  In the six months

following Kaewell's retirement and McCarthy's promotion, Plaintiff was paid for an additional 4 occasions of overtime totaling 8.5 hours.  J.A.  377.[2]

### b.   Lack of Training

In addition to unequal allocation of overtime, Plaintiff has alleged that she was offered less training than her male co-workers.  J.A. 266.  Plaintiff has conceded that she is unaware of any formal training offered to the other Computer Technicians – and Sampson testified that none has occurred since 2003 – but Plaintiff argues that Brown was evasive and unhelpful when she attempted to obtain various technical manuals or access informal field training.  J.A. 76, 270.

In May 2010, Plaintiff filed a charge of discrimination with the EEOC alleging that Sampson's evaluation, the allegedly unequal overtime hours, and the alleged deprivation of training were discriminatory treatment based on gender.

### c.   FMLA Denied and Reprimand for Absences

In September 2011, Plaintiff contacted Labor Relations Specialist Stacey Thomas ("Thomas") to request the paperwork to apply for FMLA Leave, and Thomas mailed the necessary certification to Plaintiff, followed by an e-mailed version of the forms in early October.  J.A. 281-82.  In November 2011, upon her failure to submit the FMLA certification, her initial FMLA request was denied.  J.A. 280.

On December 12, 2011, Sampson sent a memo to Thomas and Executive Chief Information Technology Officer Faisal Hassan ("Hassan") recommending disciplinary action against Plaintiff because she had at least 49 incidents of lateness or absence in 2011.  J.A. 287. Four days later, Plaintiff informed Sampson, Chapman, and Thomas that she could no longer

---

[2] The record does not contain overtime records for Brown.  Sampson responded to the grievance by noting that Plaintiff did not receive overtime prior to 2008, when she was working exclusively on Help Desk tasks, because the Help Disk is only operational during regular business hours.  J.A. 270.

drive due to new medication, and that she was also unable to lift heavy objects for medical

reasons. J.A. 291. The following week, Plaintiff e-mailed Thomas to complain about "multiple

hostile work environment issues," lack of guidance regarding leave usage, a paycheck issue that

she believed may have been retaliatory, and the procedures for a temporary modified work

accommodation due to illness. J.A. 295. On December 27, 2011, Plaintiff informed Sampson

and Chapman that she could resume driving, but that she still was unable to lift. J.A. 290. That

same day, she was issued a Notice of Oral Reprimand citing her for abuse of sick leave during

the fourth quarter of 2011. J.A. 296. The next day, Plaintiff filed a grievance against Sampson,

claiming that the reprimand lacked just cause and was issued in retaliation for her EEO

complaint against him. J.A. 298. In late January 2012, Kelvin A. Jeremiah ("Jeremiah"), then

serving as Director of the Office of Audit and Compliance ("OAC"), directed Plaintiff to the

OAC grievance process. J.A. 304. Several months later, the OAC upheld Plaintiff's oral and

written reprimands and found no evidence of discrimination or retaliation. J.A. 316.

### d.   Second FMLA Request Granted

On January 5, 2012, Plaintiff submitted an FMLA certification completed by her

physician indicating that she was unable to engage in heavy lifting and would likely require one-

half day of leave per week for an indefinite period of time. J.A. 580, 583-84. Based on that

certification, Plaintiff was approved for intermittent FMLA leave not to exceed 12 weeks

between January 7, 2012 and January 6, 2013. J.A. 106, 300. Plaintiff's FMLA Designation

Notice indicated that she would not be required to present a fitness-for-duty certificate to be

restored to employment. J.A. 203.

In March 2012, Plaintiff received her annual evaluation for the period from July 2010

through July 2011. J.A. 306. Chapman issued her an overall rating of "Unacceptable" – the first

time she had received this lowest rating on the PHA evaluation scale – citing multiple "serious errors in judgment that have in some cases had a significant negative impact on PHA operations." J.A. 306.  He also issued her a written reprimand.  J.A. 308.  Plaintiff refused to sign the written reprimand, and has questioned whether it was issued in compliance with the progressive discipline policy under the collective bargaining agreement.  J.A. 308. 316.  She has not, however, denied the substance of the evaluation or the basis of the reprimand.

### e.   Wage Dispute

On June 18, 2012, Garner was involved in a car accident in her PHA vehicle, and missed her lunch break as a result, which entitled her to either 1.25 hours of compensatory time or overtime pay for the extra time.  J.A. 336.  Plaintiff initially selected compensatory time, which was credited on July 27, 2012.  J.A. 326.  She later changed her mind and requested to be paid for the overtime.  J.A. 326.  Sampson first submitted the paperwork to remove the compensatory time and pay Plaintiff for the overtime in late July.  J.A. 328.  By mid-August, Plaintiff had not received the payment, and she contacted the OAC, which confirmed that Sampson had authorized the overtime and noted that it often takes several weeks for payroll matters to be resolved.  J.A. 330.  That week, Plaintiff contacted the payroll department directly and was informed that they did not have any record of overtime approval for June 18, 2012.  J.A. 336.  Plaintiff then asked Sampson to resubmit the overtime authorization, which he did.  J.A. 339.  The processing issues persisted, and, in early September, Plaintiff sent Executive Vice President of Human Resources Joanne Strauss ("Strauss") another form claiming the 1.25 hours, as well as 4 additional overtime hours from another date.

The hours were still not paid in late September, and Plaintiff contacted the U.S. Department of Labor ("DOL") to report that she had not received payment for a total of 9 hours

of overtime, including the 1.25 hours from the June 18 incident.  J.A. 351.  The DOL contacted

PHA's payroll department and concluded that five of the hours had been paid.  J.A. 351.  The

DOL then contacted Sampson who indicated that the four remaining hours had been approved

and submitted to payroll as of September 24, 2012.  J.A. 351.  Plaintiff believes she was

eventually paid for all of her claimed overtime hours.  J.A. 67.

### f.    Network Technician Position Created

During the summer of 2012, the PHA created a new "Network Technician" position

within the ISM Department.  J.A. 251.  Chapman had discussed with Hassan the idea of creating

the new position throughout 2011 as an effort to attract entry level workers with network-related

technical skills, which could serve as a pipeline for the more advanced network administration

roles that PHA was having difficulty filling in light of PHA's rapidly expanding computer

network infrastructure.  J.A. 109.  While the new position overlapped somewhat with the

Computer Technician position, the Network Technicians would have more responsibility related

to network administration (as opposed to computer troubleshooting).  J.A. 109.  The new

Network Technicians would also be given some low-level administrative responsibilities to

relieve the burden on the Network Administrators.  J.A. 109.  By January 2012, Hassan agreed to

create the position, and an outside recruiter was retained to seek applicants.  J.A. 111-13, 250.

Unlike the Computer Technician position, the Network Technician position was not a part of the

labor bargaining unit because the span of control and the work tasks involved in the new position

were not aligned with the jobs included in the collective bargaining agreement.  J.A. 143.  The

union did not object to this classification.  J.A. 147.  Phun and Morrow began working for PHA

as Network Technicians in late September 2012, and were introduced to PHA's computer

systems by Brown (who had recently been promoted to Network Administrator) and the other

Network Administrators.  J.A. 171-72.  The Network Technicians did not generally respond to e-mails or phone calls to the Help Desk, but instead were mostly responsible for field work to resolve network-related concerns that were raised via the Help Desk or other channels.  J.A. 115. Previously, this type of network-related technical support had been completed by the Network Administrators, and not by the Computer Technicians.  J.A. 113.

Chapman and Sampson interviewed multiple candidates for the Network Technician position before deciding to hire David Phun ("Phun") and John Morrow ("Morrow"), who received the highest scores in the interview process.  J.A. 111-13.  In light of Brown's promotion to Network Administrator, Plaintiff was the only remaining Computer Technician as of late September 2012.  J.A. 172.  Plaintiff did not apply to be a Network Technician, nor is there evidence that she expressed interest in either the Network Technician or Network Administrator positions.

### 3.  Plaintiff's Relocation to GGFE

During the spring of 2012, Plaintiff and other computer technicians completed an overtime task that involved moving some computers.  J.A. 315.  Chapman saw Plaintiff lifting computers and was unsure if this task was in compliance with her medical restriction on heavy lifting.  J.A. 108.  He e-mailed Thomas to ask if Plaintiff was still on "light duty."  J.A. 315.  He did not receive a response.  J.A. 108.   Some time later, after observing Plaintiff lifting computers while completing field work, Chapman again asked Plaintiff if she was able to lift.  J.A. 92. Plaintiff replied that her lifting restrictions remained in place, but that she would be able to resume lifting again when her FMLA period ended.  J.A. 92.  In late October 2012, Plaintiff was formally reassigned to work on Help Desk duty full time, and was relocated from Wilson Park to the Greater Grays Ferry Estates ("GGFE") location, where Sampson maintained his office.  J.A.

83. Brown, Morrow, Phun, and Chapman remained at the Wilson Park location.  J.A. 83.  At the time, Sampson e-mailed Hassan and Thomas that the transfer was due to Plaintiff's "work restriction noted in her FMLA package. . . . Right now she is very limited on [sic] the work that she can perform, thus her need to perform her work in the field has diminished."  J.A. 357-58. At Strauss's direction, Sampson later revised the e-mail to remove the reference to Plaintiff's FMLA leave, but retained the comment regarding her work limitation.  J.A. 357.

### a.  Alleged Harassment at the GGFE

Plaintiff claims that Sampson began to harass her after she was relocated.  On one occasion, Plaintiff alleges that Sampson said to another PHA employee, "When girls start shaking their asses, when I was younger I used to go crazy."  J.A. 98.  Although this comment was allegedly made while Sampson was engaged in a conversation with another employee, Plaintiff believes that Sampson made eye contact with Plaintiff and directed the comment at her. J.A. 98.  On another occasion, Sampson was speaking to a different PHA employee and said, according to Plaintiff, that "some fools put a park bench in front of his house and that he was going to get his piece."  J.A. 73.  Plaintiff was not looking at Sampson during this conversation, but glanced over occasionally and believed that Sampson was looking at her.  J.A. 73.  In elaborating her perception of the incident, Plaintiff testified, "I don't know if it was threatening or – I'm not sure. . . . I can tell you I felt threatened and that I felt that it was his – I did believe that it was more than likely – more likely than not his intent to threaten me."  J.A. 73.  In another conversation with another employee, Sampson allegedly jested, "You better act right or you'll be 302'd" (referring to an involuntary commitment to a mental health facility).  J.A. 72.  Although Plaintiff acknowledged that Sampson was not speaking directly to her at the time, she believes he directed the comment at her because "when I looked at him he was looking right at me, facing

me like I was part of the conversation," and that "taking everything into consideration . . . it appears that he's like – I – fixated to me when he's in the vicinity instead of interacting with the environment or other people."  J.A. 72.  Sampson does not recall any of the alleged comments. J.A. 156.  Plaintiff also believed that Sampson frequently stared at her when in her vicinity, and that he would rub his hand along the cubicle partitions in the office when he walked past her desk.  J.A. 65.  Sampson acknowledged that he often holds the partitions in the office for support, which he attributed to pain and balance problems arising from diabetic neuropathy in his feet. J.A. 157.

Plaintiff's complaints of harassment were not limited to Sampson.  In November 2011 – a year prior to her transfer to the GGFE – she notified HR of her discomfort when Telecommunications Engineer Marlene Tate, "kept making rude comments about women changing the water bottle," while looking at Plaintiff.  J.A.  75.  Plaintiff believes the comments were made in relation to her prior internal complaints.  J.A. 75.  Plaintiff also accused Sampson's wife, Jacqueline Sampson (also employed by PHA) of glaring at her during visits to the GGFE. J.A. 65.  Sampson denies discussing Plaintiff with his wife at any time during Plaintiff's employment at PHA.  J.A. 158.  Finally, Plaintiff complained in February 2013 of yet another conversation between other employees – this time Hassan and Security Administrator Wanda Wilkerson ("Wilkerson").  In notes she took at the time, Plaintiff recorded that "Wanda says are you going to drive next to me or behind me going home and fasial [sic] said I don't know there's a lot of stuff going on."  J.A. 364.  At her deposition, Plaintiff elaborated that Hasan replied with something to the effect of, "I don't know, it might be sexual harassment."  J.A. 66.  Plaintiff believes that Hassan was indirectly mocking Plaintiff's internal complaints about Sampson.  J.A. 66.

### b.   Sequestration and Layoffs

In late February 2012, the federal government implemented a sequestration of federal funding (the "Sequestration") that resulted in mandatory spending cuts across federal agencies. J.A. 369.  PHA received 90% of its funding from the Department of Housing and Urban Development ("HUD"), so the Sequestration led to a net cut in $42 million to the PHA.  J.A. 369.  Jeremiah, who by that time was the Interim Executive Director of the PHA, informed all staff of pending budget constraints in March 6 letter.[3]  J.A. 370.

It was soon determined that layoffs would be necessary to meet the financial constraints imposed by the Sequestration taking effect on April 1.  J.A. 141.  On the evening of March 15, Jeremiah's special assistant e-mailed PHA department heads and requested that they propose positions for elimination by 10:00 a.m. the following day.  J.A. 371.  Hassan submitted two positions:  Computer Technician (Plaintiff), and Data Control Technician (Andre Stanton).  J.A. 371.  Hassan did not consult with anyone regarding the positions selected for layoff and made the decision based on which positions (rather than specific employees) could be most easily eliminated and consolidated with existing positions.  J.A. 132.  In scrutinizing the recommendation to eliminate the Computer Technician position, Strauss asked Hassan about the similarity between the Computer Technician position and the Network Technician position. Hassan explained that the Computer Technician's duties were incorporated into the Network Technician's broader job description, and that the Computer Technician's duties could not be expanded to include the network responsibilities without union approval.  J.A.  143.  Strauss then consulted with Deputy Director of Human Resources Christopher Smith ("Smith"), who confirmed that the Network Technician position focused on network infrastructure and was significantly more advanced than the Computer Technician position, particularly with respect to

---

[3] Jeremiah was appointed President and CEO of PHA the following week.  J.A. 375.

administrative duties. J.A. 143. Strauss concluded that Plaintiff was the only employee in her position, and that there was no lesser position available for her within the organization, so her layoff was approved. J.A. 142.

After the layoff was approved, Hassan told Sampson for the first time that Plaintiff would be laid off (Sampson was previously unaware that her position was under consideration for elimination). J.A. 162. Plaintiff was issued a notice of immediate layoff on March 25, 2013. J.A. 374. Chapman, who had remained Plaintiff's formal supervisor throughout her assignment to the GGFE, found out about her layoff the following day, when he returned from vacation. J.A. 123. Sampson and Chapman then allocated Plaintiff's Help Desk responsibility to Drexel co-ops and interns, with assistance from any available ISM staff member, including the Network Technicians and Network Administrators. J.A. 163.

Three days after she was laid off, Plaintiff filed a charge of discrimination in a joint filing with the EEOC and the Pennsylvania Human Rights Commission ("PHRC"), alleging that her layoff was (1) sex discrimination because two junior male employees (Phun and Morrow) were not laid off, and (2) retaliation for her prior EEO complaint concerning overtime, unequal training, and the unsatisfactory evaluation she received from Sampson in 2008. J.A. 52.

## II.   LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  Material facts are those which "might affect the outcome of the suit under the governing substantive law." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  In deciding a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*).  In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).  In making this showing of a genuine dispute, "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016).

**III.    DISCUSSION**

**A.  Title VII**

Plaintiff's Title VII claims allege sex-based discrimination on three theories of liability: (1) disparate treatment; (2) retaliation; and (3) hostile work environment.  All three claims include allegations about her layoff, as well as alleged discrepancies in her access to overtime, lack of training, limited job task assignments, and the allegedly hostile work environment created by Sampson's and others' conduct.  Title VII claims based on circumstantial evidence, such as Plaintiff's, must be analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).  If a *prima facie* case is established, the burden of production shifts to the defendant to present a legitimate, non-discriminatory reason for its actions.  *Id.*  If such a reason is proffered, the burden shifts back to the plaintiff to demonstrate pretext – that "the employer's proffered explanation was false, and that retaliation [or discrimination] was the real reason for the adverse employment action." *Id.* (internal quotation marks omitted).  Although the burden of production of evidence shifts, "the plaintiff has the ultimate burden of persuasion at all times." *Id.*

**1.  Disparate Treatment**

Plaintiff claims that her layoff, the alleged denial of overtime, the lack of training, and assignment to Help Desk-only duty constituted disparate treatment based on her sex.  The Third Circuit has adopted a specific standard for establishing a *prima facie* case of discrimination arising from a layoffs, so Plaintiff's layoff claim will be analyzed separately from her other disparate treatment claims.

### a.   Overtime, Training, and Help Desk Duty

To establish a *prima facie* case of disparate impact discrimination under Title VII, a plaintiff must show that she: (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and, (4) the circumstances of the adverse employment action imply discrimination.  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999).  For disparate impact claims, an adverse employment action is an act that effects "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  A plaintiff may support an inference of discrimination by showing that employees who were not in a protected class were treated more favorably, *see Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013), but "differential treatment of a single member of the non-protected class is insufficient to give rise to an inference of discrimination."  *Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 359 (3d Cir. 1999) (internal quotation marks omitted).

Plaintiff is female, and it is undisputed that she was qualified for the position of Computer Technician.  Plaintiff has failed to establish, however, that an adverse action occurred in relation to her training.  She has conceded that she was unaware of any formal training that her colleagues had received.  When pressed to describe what training she was actually denied, Plaintiff expressed her belief that her male colleagues were given more opportunities for supervised learning on the job, and that her co-workers were unhelpful when she sought access to various technical support manuals.  But Plaintiff did not provide any evidence of a disparity in informal field training, nor could she specifically identify any particular materials that were

withheld from her.  There is therefore no basis upon which a reasonable jury could conclude that Plaintiff was denied training, and she has thus failed to assert a *prima facie* case of discrimination based on alleged training disparities.

Plaintiff's overtime-related discrimination claim meets the adverse action requirement, since it could represent a denial of benefits, but she has identified only one male co-worker – McCarthy – who received substantially more overtime than she did during the period when Plaintiff shared a supervisor with the other Computer Technicians.  The other comparator whose time records have been submitted to the Court was paid for only one more instance of overtime than Plaintiff, totaling 3.75 additional hours, in the 30-month period when they worked together under Chapman's supervision.  This single comparator afforded more favorable treatment is insufficient to support an inference of discrimination, and Plaintiff has offered no other evidence that she was denied overtime because of her sex.  She has therefore failed to make out a *prima facie* case of sex discrimination based on her alleged denial of overtime.

With respect to her disparate treatment claim based on assignment to Help Desk-only duty, Plaintiff has offered no direct evidence that her transfer was caused by her sex.  She has pointed to Phun and Morrow as male employees who were not limited to Help Desk duty, but they held a different job position that did not include primary Help Desk responsibility and entailed more field work duties.  Phun and Morrow are therefore not appropriate comparators for Plaintiff for the purpose of demonstrating discrimination in job task assignments.  Plaintiff has thus failed to make out a *prima facie* case of sex discrimination based on her transfer to Help Desk-only duty.

### b.   Layoff

#### i.   *Prima facie* case

To establish a *prima facie* case based on an allegedly discriminatory layoff, a plaintiff

must show "[(1) she] was in the protected class, [(2) she] was qualified, [(3) she] was laid off,

and [(4)] other unprotected workers were retained." *Armbruster v. Unisys Corp.*, 32 F.3d 768,

777 (3d Cir. 1994).

The first three elements of Plaintiff's *prima facie* case are easily satisfied, and Defendants

do not contest them:  Plaintiff was a member of a protected class, she was qualified for her

position (as shown by, among other things, the fact that she held the job for more than 13 years

and was not terminated for performance issues), and she was laid off.  The only *prima facie*

element in dispute is whether other workers not in Plaintiff's protected class were laid off.

Defendants argue that this element requires a showing that other *similarly situated* unprotected

workers were retained.  Plaintiff counters by citing *Marzano v. Computer Science Corp.*, 91 F.3d

497 (3d Cir. 1996), for the proposition that the retained unprotected workers need not be

similarly situated, lest employers be allowed to avoid discriminatory layoff claims by

strategically restructuring job positions to leave the targets of discrimination with no similarly

situated peers.  The Third Circuit has not definitively established whether the retained

unprotected employees must be similarly situated to satisfy the *prima facie* burden in the context

of a Title VII claim,[4] but it is unnecessary to resolve this issue because, even if the retention of

---

[4] *Marzano* concerned a pregnancy discrimination claim under the New Jersey Law Against Discrimination ("NJLAD"), which was analyzed "adop[ting] the methodology governing federal employment discrimination law," *Marzano*, 91 F.3d at 502.  The holding relies on the *McDonnell Douglas* framework and case law concerning federal discrimination statutes, without any indication that the analysis is unique to the NJLAD.  *See id.* at 502-11. Ordinarily, such a case would provide reliable guidance in a layoff-related case under federal employment statutes, including Title VII.  However, in a later case concerning the Age Discrimination in Employment Act ("ADEA"), the Third Circuit held, with no acknowledgment of *Marzano*,  that "to present a *prima facie* case raising an inference of age discrimination in a reduction in force situation, the plaintiff must show, as part of the fourth element, that the employer retained someone similarly situated to him."  *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 250 (3d Cir.

non-similarly situated male employees satisfied Plaintiff's *prima facie* burden, her layoff-related Title VII claim fails at the pretext stage.

### ii. Legitimate non-discriminatory reason

Defendants have proffered that Plaintiff was laid off from her position as a Computer Technician when 82 employees were let go as a result of budget cuts imposed after PHA lost $42 million in funding following the Sequestration of federal funds in February 2013.  The Computer Technician position was chosen, they assert, because the Help Desk functions of the role could be assumed by a number of other employees, interns, or Drexel co-ops, and any field work could be added to the Network Technicians' network-focused technical support duties.

### iii. Pretext

To defeat summary judgment when the defendant has responded with a legitimate, non-discriminatory reason for its action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

When a plaintiff offers no affirmative evidence of discrimination but instead attempts to show pretext by demonstrating the weakness of an employer's proffered reasons, "the plaintiff's

---

2002).  In three non-precedential Title VII cases, the Third Circuit has cited the *Anderson* standard, or limited the reach of *Marzano*.  *See Jackson v. Temple Univ. Hosp., Inc.*, 501 F. App'x 120, 122 (3d Cir. 2012) (citing *Anderson* for the requirement that retained unprotected workers be similarly situated); *Wood v. Univ. of Pittsburgh*, 395 F. App'x 810, 814 (3d Cir. 2010) (same); *Lula v. Network Appliance, Inc.*, 245 F. App'x 149, 152 (3d Cir. 2007) (interpreting *Marzano* to permit consideration of non-similarly situated employees at the pretext stage when there is evidence of bad faith reorganization, but to require similarly situated comparators at the *prima facie* stage). However, despite this apparent preference for the *Anderson* standard in non-precedential opinions, there is no binding case law on this issue in the Title VII context, which leaves open the question of whether to adopt a standard that arises from substantively analogous state law claims (*i.e., Marzano*) or discrimination claims brought under different federal statutes (*i.e., Anderson*).

evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* (internal citations omitted). The inquiry is not whether the employer was "wise, shrewd, prudent, or competent," but rather whether the proffered reasons are so implausible that a factfinder could rationally believe that they were not, in fact, the true reasons for the employer's action. *Id.* at 765. Accordingly, it is not enough for a plaintiff to "simply show that the employer's decision was wrong or mistaken," but instead the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (internal quotation marks and citations omitted).

Plaintiff has not cited any direct evidence to suggest that the 82 layoffs that occurred in March 2013 were caused by anything other than the Sequestration-related budget crisis then facing the PHA. She has also not offered any affirmative evidence that Defendants' proffered reasons for selecting her specific position for elimination are pretextual. Instead, Plaintiff's argument relies on circumstantial evidence to support two contentions: Her position was substantially equivalent to the newly created Network Technician position, and she would not have been laid off if she had been restored to field work in early 2013.

Plaintiff's primary argument is that the Network Technician position was essentially the same job as Computer Technician, so, she contends, distinguishing the roles for layoff purposes was pretextual. But the record establishes that the Computer Technician and Network Technician were different positions. While the new Network Technicians performed some

duties also covered by the Computer Technician position, Plaintiff has not produced evidence to undermine Defendants' contention that the Network Technician position was conceived as a leadership pipeline, that it was excluded from the collective bargaining unit that included the Computer Technician position because it entailed broad administrative responsibilities, and that it involved network-related technical duties that were not included in the Computer Technician role.  Furthermore, Plaintiff has not presented any evidence to suggest that the months-long process of developing, defining, recruiting, and eventually hiring two outside applicants for the Network Technician position was a scheme designed to turn Plaintiff's job into a dead-end role. In sum, the record supports Defendants' consistent position that the Network Technician role was created as part of a strategic restructuring of the ISM Department driven by business needs, and Plaintiff has not offered evidence to undermine this account.

Plaintiff also contends that she would not have been laid off if she had been restored to field work in early 2013.  But Hassan's recommendation to eliminate the Computer Technician position focused on the formal job description and whether the *position* could be feasibly eliminated, not whether the particular tasks Plaintiff was performing at the time could be easily reassigned.  Upon a review of the organizational structure and formal position descriptions, Strauss concurred with Hassan's recommendation because the tasks of the position (including field work) could be redistributed with as little disruption as possible to ISM operations.  Given that rationale, Plaintiff would have been laid off even if she had been assigned to field work in early 2013 and Plaintiff has not produced any evidence to question Defendants' account of the layoff decision-making process.  Since Plaintiff has failed to produce evidence to undermine Defendants' rationale for her layoff and has failed to establish a *prima facie* case of disparate

impact sex discrimination based on the other adverse actions she alleged, Defendants' motion for summary judgment shall be granted with respect to Plaintiff's Title VII disparate impact claims.

### 2.  Retaliation

The *prima facie* standard for Title VII retaliation claims is the same as for discrimination claims, except that an adverse action need not be a significant change in employment status, but rather consists of any action that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 58 (2006)).

Plaintiff's Title VII retaliation claims fail for the same reasons as her disparate treatment claims:  She had not provided evidence that she was denied training, nor has she identified more than a single comparator to suggest that she was given less overtime than peers who had not engaged in prior EEO activity, and she has failed to show that Defendants' proffered non-discriminatory reasons for eliminating her position were pretextual.  Defendants' motion for summary judgment on Plaintiff's Title VII retaliation claims shall be granted.

### 3.  Hostile Work Environment

To prevail on a claim that an employer created a hostile work environment through sexual harassment, a plaintiff must establish that "1) [she] suffered intentional discrimination because of []her [protected status]; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of *respondeat superior* liability."  *Mandel*, 706 F.3d at 167.

Plaintiff's sexual harassment claims – based almost entirely on comments made to others during conversations in which Plaintiff was not involved – cannot survive summary judgment

because she has not identified a pattern of severe or pervasive discrimination.  The only evidence

Plaintiff has offered that any of the comments or behaviors were directed at her (let alone

motivated by her sex or prior EEO activity) is her own suspicion.  Even if the various

conversations Plaintiff overheard were directed at her, the scattered comments over a several-

month period that she has cited were neither severe nor pervasive.  Furthermore, Plaintiff herself

had difficulty explaining how the remarks by Sampson about "getting his piece," or another

employee getting "302'd," or Marlene Tate's comments about changing the water bottle

amounted to harassment.  And even assuming that Hassan and Wilkerson's joke about sexual

harassment was directed at Plaintiff, that single incident is not a pervasive pattern of conduct.

The only allegedly pervasive behavior cited by Plaintiff was Sampson staring at Plaintiff and

running his hand along the top of her cubicle whenever he walked by her desk (which he

attributes to diabetic foot pain).  But Plaintiff has not alleged that the actions were done in a

suggestive or otherwise inappropriate matter, nor has she alleged that Sampson ever made a

comment in conjunction with these behaviors.  In sum, Plaintiff has failed provide evidence of a

pervasive or severe course of behavior that would detrimentally affect a reasonable person in her

circumstances, and Defendants' motion for summary judgment shall be granted with respect to

Plaintiff's Title VII hostile work environment claim.[5]

**B. FMLA**

Plaintiff has alleged both FMLA interference and FMLA retaliation claims arising from

her transfer to the GGFE, the alleged failure to restore her to her position after her leave expired,

and her eventual layoff.  As in the Title VII context, there are specific legal standards for layoff-

---

[5] The Third Circuit has held that Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts."  *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).  Accordingly, Defendants' motion for summary judgment shall be granted with respect to Plaintiff's PHRA claims for the same reasons as for her Title VII claims.

based FMLA claims, so those claims will be analyzed separately from the claims arising from Plaintiff's transfer to the GGFE.

### 1.   Assignment to Help Desk-Only Duty at GGFE

#### a.   FMLA Interference

To establish an FMLA interference claim, an employee must show that: "(1) [she] was entitled to benefits under the FMLA; and, (2) that [she] was denied them."  *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 252 (3d Cir. 2014).  The FMLA provides that an employee "shall be entitled, on return from [FMLA] leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1); *see also Budhun*, 765 F.3d at 252.  In the context of intermittent leave, "the employer may require [the employee] to transfer temporarily to an available alternative position offered by the employer for which the employee is qualified and that (A) has equivalent pay and benefits; and (B) better accommodates recurring periods of leave than the regular employment position of the employee."  29 U.S.C. § 2612(b)(2). However, when intermittent leave ends "the employee must be placed in the same or equivalent job as the job he or she left when the leave commenced."  29 C.F.R. § 825.204(e).  An equivalent position is "one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status.  It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority."  29 C.F.R. § 825.215(a).

Plaintiff claims that, to the extent that she was assigned to Help Desk-only duties in November 2012 to better accommodate her intermittent FMLA leave, she should have been

returned to field work at the completion of her leave in January 2013 and that Defendants' failure to restore her constitutes FMLA interference.  Construing her transfer to Help Desk duty as a temporary transfer to accommodate her FMLA leave is reasonable given that Sampson originally cited Plaintiff's FMLA leave as the reason for the transfer.  If the transfer was, in fact, to accommodate her FMLA leave, then Plaintiff was entitled to be restored to her prior job when her intermittent FMLA ended.  Defendants contend that Plaintiff's tasks at the GGFE were not actually a departure from her prior role, but this issue remains in dispute.  There is therefore a genuine dispute of material fact concerning whether keeping Plaintiff assigned to Help Desk-only tasks after her FMLA expired interfered with her FMLA right to be restored to her original position.

### b.   FMLA Retaliation

#### i.   *Prima facie* case

An FMLA retaliation claim requires a plaintiff to show that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).  With respect to the first element, it is undisputed that Plaintiff invoked her right to FMLA leave.  Turning to the second element, a transfer to light duty that "significantly alter[s an employee's] duties and status" can constitute an adverse employment action.  *Caver v. City of Trenton*, 420 F.3d 243, 256 (3d Cir. 2005).  Defendants dispute that Plaintiff's job duties and status actually changed when she was transferred to the GGFE, but given that she would not have been eligible for overtime while serving on Help Desk-only duty, and that the assignment removed the field work portion of her job, a jury could reasonably conclude that the transfer was an adverse action.  Finally, with respect to causation,

Sampson's e-mail citing Plaintiff's FMLA leave as the reason for her transfer provides evidence that the transfer was caused by Plaintiff's FMLA leave.  Plaintiff has thus made out a *prima facie* case of FMLA retaliation with respect to her transfer to Help Desk-only status.

### ii. Legitimate non-discriminatory reason

A transfer during intermittent leave to a position that better accommodates periodic absences is permitted by the FMLA.  *See* 29 U.S.C. § 2612(b)(2).  Thus, even if Plaintiff's transfer was motivated by her FMLA leave, the statute provides Defendants with a legitimate non-discriminatory basis for that transfer if it was done to better accommodate Plaintiff's leave.

### iii. Pretext

As discussed above in the context of FMLA interference, Sampson's e-mail provides some evidence that Plaintiff's transfer to Help Desk-only status was an FMLA accommodation. But given that the transfer did not occur until late in the tenth month of a twelve-month period for approved leave, a jury could instead reasonably conclude that the true purpose of the transfer was to retaliate for the taking the leave in the first place.  It would also be reasonable to adopt Defendants' position that Plaintiff's job never actually changed, since she had been assigned exclusively to the Help Desk at previous times in her tenure as a Computer Technician.  There thus remains a genuine factual dispute regarding Plaintiff's FMLA retaliation claims arising from her transfer to the GGFE.

In sum, the record would allow a factfinder to reasonably conclude either that (1) Plaintiff was transferred to accommodate her FMLA leave (but not restored, leading to FMLA interference); (2) Plaintiff was transferred in retaliation for taking FMLA leave (*i.e.*, FMLA retaliation, but not interference); or (3) Plaintiff's job position never changed (*i.e.*, neither FMLA

interference nor retaliation).  Therefore, there remain disputed issues of material fact with respect to Plaintiff's non-layoff-related FMLA claims.

The Individual Defendants have each argued that they are not liable to Plaintiff under the FMLA because they are not "employers" within the meaning of the statute.  The statute defines "employers" to include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."  29 U.S.C. § 2611(4)(A)(ii)(I).  To determine if a person meets this statutory definition, the Third Circuit has adopted an "economic reality" test, which looks to whether a person "(1) had the power to hire and fire the employee, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Haybarger v. Lawrence Cnty. Adult Probation and Parole*, 667 F.3d 408, 418 (3d Cir. 2012). No one factor is dispositive, and a court may look beyond the specific factors to consider "any relevant evidence" to determine the "economic reality of the employment situation."  *Id.*

Plaintiff has identified sufficient facts to support a reasonable conclusion that each of the Individual Defendants was an employer during Plaintiff's FMLA leave.  Chapman remained Plaintiff's direct supervisor.  Sampson was her second-line supervisor, and assumed de facto daily supervision of Plaintiff when she transferred to the GGFE.  Strauss administered Plaintiff's FMLA leave, kept the time records, and advised Sampson regarding the transfer to the GGFE. Hassan oversaw the department in which Plaintiff worked.  And Jeremiah was the interim executive director of the PHA, holding ultimate authority over all employment decision, as demonstrated by his request for layoff recommendations from all department heads.  While some of the Individuals Defendants had a more attenuated connection with Plaintiff, the record at this stage does not eliminate any of them as "employers" for FMLA purposes.

However, there is not a corresponding basis to conclude that all of the Individual Defendants interfered with Plaintiff's FMLA rights or retaliated against her for exercising those rights. Specifically, there is no evidence that Jeremiah knew about transfer or Plaintiff's day-to-day tasks at any point. On the other hand, there is evidence that Sampson, Chapman, and Strauss collaborated on the decision to transfer Plaintiff to GGFE and the subsequent failure to restore her to field work in January 2013, and that Hassan was aware of the transfer and Plaintiff's lack of field work. Accordingly, Defendants' motion for summary judgment on Plaintiff's non-layoff-related FMLA claims shall be granted with respect to Jeremiah, but denied with respect to all other Defendants.

### 2. Layoff

#### a. FMLA Interference

The FMLA right to reinstatement does not entitle an employee to a "right, benefit or position to which the employee would not 'have been entitled had the employee not taken the leave.'" *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 141 (3d Cir. 2004) (quoting 29 U.S.C. § 2614(a)(3)). Thus, "if an employee is discharged during or at the end of a protected leave for a reason unrelated to the leave, there is no right to reinstatement." *Id.*

Plaintiff alleges that her layoff constituted FMLA interference because it ultimately prevented her from being reinstated to the full tasks of a Computer Technician. But even if Plaintiff could show that her layoff, which occurred more than two months after her FMLA leave ended, was part of a protracted failure to restore her to her prior job, she has failed provide any evidence that her position would have survived the Sequestration budget crisis had she not taken the leave. Hassan recommended cutting the Computer Technician position because it could be absorbed into other positions in the ISM Department more easily than the other jobs in the

department.  Strauss reviewed that recommendation with reference to the formal job description, not the Help Desk-only tasks Plaintiff was actually performing.  Plaintiff has provided no evidence to undermine this account or to otherwise suggest that her position would have been excluded from the layoff if she had not taken FMLA leave or been assigned to light duty.  She has thus failed to show a dispute of material fact that, if resolved in her favor, would permit a factfinder to conclude that her layoff constituted FMLA interference, and Defendants' motion for summary judgment shall therefore be granted with respect to that claim.

### b.   FMLA Retaliation

Plaintiff has not presented direct evidence that her layoff was motivated by her FMLA leave, so her layoff-related FMLA retaliation claim must be analyzed under the *McDonnell Douglas* framework.

### i.   *Prima facie* Case

To establish a *prima facie* case based on an allegedly discriminatory layoff under the *McDonnell Douglas* framework, a plaintiff must show "[(1) she] was in the protected class, [(2) she] was qualified, [(3) she] was laid off, and [(4)] other unprotected workers were retained." *Armbruster*, 32 F.3d at 777.  For the purpose of Plaintiff's FMLA retaliation claim, the relevant protected class consists of employees who have invoked FMLA rights.  Plaintiff has thus met the first three *prima facie* elements without dispute:  She invoked her FMLA rights, she was qualified for her position as a Computer Technician, and she was laid off.  That leaves only the fourth element of her *prima facie* case in dispute – whether other unprotected workers were retained.  As in the Title VII context, it is not clearly established in the Third Circuit whether the unprotected retained workers referenced to support a layoff-related FMLA retaliation claim must be similarly situated to the plaintiff.  However, it is again unnecessary to resolve this legal

question because Defendants have asserted a legitimate non-discriminatory reason for Plaintiff's layoff and Plaintiff has failed to provide evidence that this reason was pretextual.

Defendants have proffered that Plaintiff was laid off as part of a mass layoff necessitated by a sudden $42 million Sequestration-related budget cut in March 2013. Defendants have consistently maintained and provided evidence that the layoff decisions focused on positions, not individual employees, and that the Computer Technician position was chosen for layoff because it would be a less disruptive position to eliminate than others in the ISM Department. Plaintiff has not offered evidence to undermine this rationale, nor has she shown that it was concocted after that fact to justify her layoff or that her assignment to Help Desk-only duty was carried out to trap her in a dead-end job that would be vulnerable to layoff. In fact, the decision to eliminate Plaintiff's position was made without the input of either Chapman or Sampson – the supervisors primarily responsible for managing her job tasks and accommodating her FMLA leave – and Chapman did not even know that Plaintiff was being laid off until it had already happened. Plaintiff has thus failed to demonstrate a dispute of material fact that would prevent summary judgment on her layoff-related FMLA retaliation claim. Defendants' motion for summary judgment on Plaintiff's FMLA retaliation claim shall therefore be granted to the extent that the claim is based on her layoff.

### C.   FLSA Retaliation

Plaintiff also claims that her layoff and alleged harassment were carried out in response to her wage complaint to the DOL in 2012, and were thus unlawful retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. FLSA retaliation claims are analyzed through the *McDonnell Douglas* framework. *See Cononie v. Allegheny Gen. Hosp.*, 29 F. App'x 94, 95 (3d Cir. 2002). To establish a *prima facie* case of retaliation, a plaintiff must

show that: (1) she engaged in protected activity; (2) she suffered an adverse action by the

employer either after or contemporaneous with the employee's protected activity; and, (3) a

causal connection between the employee's protected activity and the employer's adverse action.

*See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007); *Wildi v. Alle-Kiski Med. Ctr.*,

659 F. Supp. 2d 640, 664 (W.D. Pa. 2009) (applying *prima facie* elements from *Marra* to a

FLSA retaliation case).

　　　Defendants do not contest that Plaintiff engaged in FLSA-protected activity or suffered

an adverse action when she was laid off.  They do, however, argue that Plaintiff has failed to

offer any evidence that her layoff, any alleged harassment, or other adverse actions were

connected to her FLSA-protected complaints.  Plaintiff offers only a tepid attempt to make such

a connection:  a single sentence in her brief noting that Plaintiff's transfer to the GGFE occurred

only a month after the FLSA complaint was resolved in September 2012.  While a *prima facie*

case may be supported through an "'unusually suggestive' proximity in time between the

protected activity and the adverse action" under "certain narrow circumstances," *Marra*, 497

F.3d at 301, those circumstances are not present here, particularly in light of the evidence that the

transfer was based on Plaintiff's FMLA-related job restrictions.  The "unusually suggestive"

period described in *Marra* must be short enough to allow the inference that the protected activity

led directly to the retaliatory act.  *See, e.g.*, *Motto v. Wal-Mart Stores East, LP*, 563 F. App'x

160, 164 (3d Cir. 2014) ("[W]e do not find the eleven-day period unusually suggestive of

retaliation.").  The passage of over a month between the FLSA-protected activity and the transfer

to the GGFE does not meet this "unusually suggestive" standard and Plaintiff has offered no

other evidence to suggest a connection between her overtime complaint and any adverse actions.

She has thus failed to make out a *prima facie* case of FLSA retaliation, and Defendants' motion for summary judgment shall be granted on that claim.

### D.   Breach of Contract

In addition to her federal statutory claims, Plaintiff claims that her layoff and alleged denial of overtime constituted breaches of PHA's overtime and equal employment policies.[6]  In Pennsylvania, while an employee handbook or policies "could create a contractual relationship while not supplanting the at-will employer-employee relationship," *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 940 (Pa. Super. 2011),  "an employment manual or other workplace rules would be deemed a binding contract only where the benefit was extended at the time of hire, and where there is evidence by which a reasonable person would conclude that the employer intended to be bound by its terms."  *Garcia v. Matthews*, 66 F. App'x 339, 342 (3d Cir. 2003) (citing *Bauer v. Pottsville Area Emergency Med. Servs., Inc.*, 758 A.2d 1265, 1269 (Pa. Super. 2000)); *see also Morosetti v. La. Land and Exploration Co.*, 564 A.2d 151, 153 (Pa. 1989) (holding that an employment policy may give rise to a contractual duty only when the employer "offered it as binding terms of employment").

The PHA Employee Handbook that became effective in the summer of 2012 contains both an EEO policy and an overtime policy, and provides that the Employee Handbook supersedes any prior policies.  The Handbook also contains, as its first General Policy, in bold italicized type: "This handbook is not an employment contract and should be considered only as a general statement of policies, procedures, and benefits."  J.A. 185.  There is therefore a clear indication that PHA did *not* intend to be contractually bound by the policies in the Handbook, and these policies cannot serve as the basis for a breach of contract claim.

---

[6] Plaintiff did not include any argument concerning her breach of contract claim in either her initial opposition or her sur-reply brief opposing summary judgment.

Plaintiff attached to her Complaint a version of PHA's overtime policy from a Human Resources Manual (rather than the Handbook) and an apparently stand-alone EEO policy. Setting aside the question of whether these policies would be superseded by the Handbook, there is no evidence that Plaintiff ever received the separate policies, let alone received them as part of an offer of employment with the indicia of contractual intent required under Pennsylvania law. These documents are thus unable to serve as the basis for a breach of contract claim. Since Plaintiff has not come forward with any other basis for her contract claim, nor provided any substantive argument as to why the documents in the record create a contractual duty under Pennsylvania law, Defendants' motion for summary judgment shall be granted with respect to Count VI.

## IV.     Conclusion

Plaintiff has demonstrated a genuine dispute of material fact regarding her claims for FMLA interference and retaliation arising from her transfer to Help Desk-only duty at the GGFE and failure to assign her field work after her FMLA period ended, and those claims therefore survive summary judgment. Defendants' motion shall be granted, however, with respect to Plaintiff's FMLA claims related to her layoff, as well as all Title VII, FLSA, PHRA, and contract claims.


Dated:  August 22, 2016

<div style="margin-left:50%">

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**

</div>